1   BINGHAM McCUTCHEN LLP
    BETH H. PARKER (SBN 104773)
2   DEBORAH A. ADLER (SBN 209525)
    TERESA L. FEDERER (SBN 221454)
3   GISELLE FAHIMIAN (SBN 225572)
    Three Embarcadero Center
4   San Francisco, CA 94111-4067
    Telephone:  415.393.2000
5   Facsimile:  415.393.2286

6   PLANNED PARENTHOOD FEDERATION OF
    AMERICA
7   EVE C. GARTNER
    HELENE T. KRASNOFF
8   ROGER K. EVANS
    434 West 33rd Street
9   New York, New York 10001
    Telephone:  212.541.7800
10  Facsimile:  212.247.6811

11  Attorneys for Plaintiffs

12
                    UNITED STATES DISTRICT COURT
13
                 NORTHERN DISTRICT OF CALIFORNIA
14
                      SAN FRANCISCO DIVISION
15

16
    PLANNED PARENTHOOD FEDERATION OF          No. C-03-4872 PJH
17  AMERICA, INC. and PLANNED
    PARENTHOOD GOLDEN GATE,                   OPPOSITION TO DEFENDANT'S
18                                            MOTION TO COMPEL BY
                 Plaintiffs,                  PLAINTIFFS PLANNED
19                                            PARENTHOOD FEDERATION OF
             v.                               AMERICA, INC. AND PLANNED
20                                            PARENTHOOD GOLDEN GATE
    JOHN ASHCROFT, Attorney General of the
21  United States, in his official capacity,
                                              Date:     Friday, March 5, 2004
22               Defendant.                   Time:     2:00 p.m.
                                              Place:    Courtroom 3, 17th Floor
23                                            Judge:    Hon. Phyllis Hamilton

24

25

26

SF:21550197.1/0999996-2960011466                              Case No. C-03-4872 PJH

OPPOSITION TO MOTION TO COMPEL

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................. 1

II.  FACTS ................................................................................................................. 2

    1.  The History of the Discovery Dispute ...................................................... 2

    2.  Discovery in NAF v. Ashcroft ................................................................... 4

    3.  The Relevance of the Medical Records Sought ........................................ 5

    4.  The Burden and Impact of Defendant's Requests .................................... 6

    5.  Affiliate Records are Not in PPFA's Custody and Control ...................... 6

III. PPFA SHOULD NOT BE COMPELLED TO PRODUCE ITS AFFILIATES' MEDICAL RECORDS ...................................................................................... 7

    A.  Defendant's Motion Should Be Denied Because The Medical Records Are Irrelevant ................................................................................................ 7

    B.  Defendant's Motion Should Be Denied Because It Imposes Unacceptable Burdens ................................................................................................... 9

    C.  Defendant's Motion Should Be Denied Because It Violates State Privacy Law ....................................................................................................... 11

        1.  California ................................................................................... 12

        2.  New York ................................................................................... 12

        3.  Washington D.C. ....................................................................... 13

        4.  Kansas ....................................................................................... 13

        5.  Pennsylvania ............................................................................. 14

    D.  Defendant's Discovery Efforts Are Too Late ....................................... 14

    E.  Affiliates' Medical Records Are Not in PPFA's Possession, Custody or Control ................................................................................................ 15

IV.  PPFA AND PPGG SHOULD NOT BE COMPELLED TO UNREDACT PHYSICIAN NAMES FROM MEDICAL RECORDS ................................................ 18

V.   THE COURT SHOULD DENY DEFENDANT'S ADMINISTRATIVE REQUEST TO ALTER THE PRE-TRIAL SCHEDULING ORDER ........................... 20

VI.  CONCLUSION ................................................................................................. 21

1

TABLE OF AUTHORITIES

2

Page

3

CASES

4

*Berman v. Duggan*, 119 Pittsburgh Legal Journal 226 (Allegheny Cty., Civ. Div.
  Jan. 6. 1971) ........................................................................................................ 14

5

6

*Brillantes v. Superior Court*, 51 Cal. App. 4th 323 (1996) ........................................ 12

7

*Caesar v. Mountanos*, 542 F.2d 1064 (9th Cir. 1976) ................................................ 9

8

*CBS Broad., Inc. v. Echostar Communications Corp.*, No. 98-2651-CIV-
  Dimitrouleas/Seltzer, slip. op. at 26-27 (S.D. Fla. Jan. 10, 2003) ........................ 16

9

*Chaveriat v. Williams Pipe Line Company*, 11 F.3d 1420 (7th Cir. 1993)................... 15

10

*Edwards v. U.S.,* 767 A.2d 241 (D.C. 2001)................................................................ 13

11

*Flores v. Amigon*, 233 F. Supp. 2d 462 (E.D.N.Y. 2002).................................... 19, 20

12

*In re Grand Jury Investigation in New York County*, 98 N.Y.2d 525 (2002)............... 13

13

*International Union, United Automobile, Aerospace, and Agricultural Implement
  Workers of America v. Brock*, 477 U.S. 274 (1986) ............................................. 18

14

*Jones v. Superior Court*, 119 Cal. App. 3d 534 (1981) ............................................. 12

15

*National Abortion Federation v. Ashcroft*, 2004 WL 292079 (N.D. Ill. Feb. 6,
  2004) ...................................................................................... 4, 5, 15, 16, 20

16

17

*Nelson v. U.S.,* 649 A.2d 301 (D.C. 1994)................................................................ 13

18

*Oil Heat Institute of Oregon v. Northwest Natural Gas*, 123 FRD 640 (D. Oregon
  1988) .................................................................................................................. 16

19

*Palay v. Superior Court*, 18 Cal. App. 4th 919 (1993) .............................................. 12

20

*People v. Superior Court*, 25 Cal. 4th 703 (2001) .................................................... 12

21

*PPGG v. Superior Court (Foti)*, 83 Cal.App.4th 347 (2000) ..................................... 20

22

*Roe v. Operation Rescue*, 919 F.2d 857 (3d Cir. 1990) ........................................... 18

23

*Searock v. Stripling*, 736 F.2d 650 (11th Cir. 1984) ................................................. 15

24

*Stenberg v. Carhart*, 530 U.S. 914 (2000)................................................................ 7

25

*United States v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir. 1980) .............. 9, 10

26

1

TABLE OF AUTHORITIES
(continued)

2
Page

3   *Wesley Medical Center v. Clark*, 669 P.2d 209 (Kan. 1983) ....................................... 13

4   *Yin v. California*, 95 F.3d 864 (9th Cir. 1996)........................................................ 9

5   *Zeng Liu v. Donna Karan Int'l, Inc.*, 207 F. Supp. 2d 191 (S.D.N.Y. 2002) ............................ 20

6

**STATUTES**

7
42 Pa. C.S.A. § 5929 ........................................................................... 14

8   Cal. Evid. Code § 995 .......................................................................... 12

9   California Evidence Code § 994 ................................................................ 12

10

11

**OTHER AUTHORITIES**

12   Art. XIII § 3 (a).............................................................................. 16

13   Art. XIII § 3 (b).............................................................................. 16

14   Art. XIII § 3 (c).............................................................................. 16

15   Art. XIII § 3 (f).............................................................................. 16

16   Articles III § 2(a)............................................................................ 16

17   Articles III § 2 (c)........................................................................... 16

18   D.C. Code Ann. § 14-307 (2001)................................................................ 13

19   D.C. Code Ann., Art. I, Bill of Rights § 4 (2001)............................................ 13

20   Kan. Stat. Ann. §§ 60-427 .................................................................... 13

21   Kan. Stat. Ann. § 60-427(a)(4) ............................................................... 13

22   Kan. Stat. Ann. §§ 60-427(b)(4) .............................................................. 13

23   N.Y. Pub. Health Law § 18(1)(b) .............................................................. 13

24   N.Y. Pub. Health Law § 18(1)(b)(6) ........................................................... 13

25

26

1

<u>TABLE OF AUTHORITIES</u>
(continued)

2                                                                                                                    <u>Page</u>

3                                              **<u>RULES</u>**

4    Fed. R. Civ. P. 26(b)(2)(iii) ............................................................................. 11

5    Fed. R. Civ. P. 45 ................................................................................... 5, 15

6    Fed. R. Evid. 501 ...................................................................................... 12

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1    **I.    INTRODUCTION**

2        Defendant has moved to compel the production of medical records, from six

3    member-affiliates of Planned Parenthood Federation of America ("PPFA"), of women who have

4    had abortions in the mid-to-late second trimester of pregnancy.[1]  PPFA estimates that

5    Defendant's request would entail the production of more than 900 medical records.  *See*

6    Declaration of Helene T. Krasnoff ("Krasnoff Decl.") at ¶ 4.  In addition, Defendant has moved

7    to compel that the names of the physicians who performed those abortions also be provided,[2] and

8    Defendant has moved for additional time, and leave to conduct additional non-party depositions.

9        Plaintiffs PPFA and PPGG oppose these motions.  First, and most fundamentally,

10   the medical records which Defendant seeks are irrelevant.  The records are not likely to provide

11   or lead to evidence relevant to the issues in this litigation.  Second, whatever marginally relevant

12   information the records may provide is vastly outweighed by the burdens on the privacy

13   concerns of the hundreds of women whose medical records will be opened to the government,

14   even though those women are not remotely connected to this litigation, as well as the enormous

15   burden such production places on PPFA and its member-affiliates.  Third, and perhaps most

16   obvious, this discovery is too late, and inexcusably so.  Defendant's motion was filed on

17   February 24, 2004, less than one week before the close of discovery pursuant to the scheduling

18   order in this case.  Fourth, in any event, as PPFA has repeatedly advised Defendant, the records

19   of its member-affiliates are not in its custody and control.

20        Accordingly, Defendant's motions should be denied.

21

22   _____

23   [1] Defendant erroneously and inflammatorily refers to the records he seeks as relating to "late-term abortions."  Defendant's Motion to Compel ("Def. Motion") at 1.

24   [2] Defendant has sought the redaction of the affiliate and physician names from medical records already produced by PPFA and Planned Parenthood of Golden Gate ("PPGG").  The names of

25   the affiliates have been provided to Defendant for those records produced by PPFA to date, so all that remains of this issue is the name of the physician.

26

1    **II.      FACTS**

2                    **1.       The History of the Discovery Dispute**

3                    On December 4, 2003, Defendant served extensive discovery requests on

4    Plaintiffs PPFA and PPGG.  Those requests sought, among many other things, medical records

5    for all patients at PPGG for three years and at every other PPFA member-affiliate for one year,

6    where an abortion was performed by "the procedure that is known or may be referred to

7    variously as 'intact dilation and evacuation,' 'intact D&E,' 'intact D&E variation,' 'intact

8    dilation and extraction,' or 'D&X.'"  *See* Document Request No. 15 to PPFA; Document

9    Request No. 1 to PPGG.  Defendant's requests did not define any of the quoted terms, in spite of

10   the fact that the "reach" of the definitions is a contested issue, and the terms do not have a

11   uniform definition among medical professionals or in the medical literature.  Defendant also

12   sought medical records from all PPFA member-affiliates for one year where a chemical agent

13   was utilized to effect intrauterine fetal demise prior to an abortion.  *See* Document Request No.

14   18 to PPFA.  It is these two categories of records, and the contents of them, that are the subject

15   of this Motion.

16                   Pursuant to the Scheduling Order in this case, PPFA and PPGG filed their

17   objections to Defendant's requests on December 19, 2003.  PPFA and PPGG both objected to

18   Defendant's requests for medical records on the grounds of relevance and burden, as well as

19   vagueness, because Defendant had not provided a definition of the various abortion methods for

20   which he sought records.  PPFA additionally objected to the requests for medical records of its

21   member-affiliates because those documents are not in its possession, custody, and control.  *See*

22   PPFA Dec. 19 Objections, attached as Exhibit ("Ex.") A to the Declaration of Deborah A. Adler

23   ("Adler Decl."); PPGG Dec. 19 Objections, Adler Decl. Ex. B.  On December 30, 2003,

24   Defendant provided definitions for the terms.

25                   On January 9, 2004, PPFA identified the three member-affiliates who utilize a

26   chemical agent to effect intrauterine fetal demise prior to an abortion – three of the same

1    affiliates whose records are the subject of this Motion.  *See* PPFA Jan. 9 Response to

2    Interrogatory No. 2, Adler Decl. Ex. C.  PPFA also provided Defendant with information about

3    the number of patients who had been offered such an injection – approximately 468 women in

4    2002.[3]  *See id.* at Response to Interrogatory No. 10.  PPFA informed Defendant that it believed

5    that the burden of searching, obtaining, redacting, and producing that many medical records

6    outweighed their possible relevance.  *See id.* at Responses to Document Requests Nos. 18-20.  In

7    addition, PPFA repeated its other objections to producing the medical records of these, or any,

8    member-affiliates.  *See id.* at Responses to Document Requests Nos. 15-17.  However, because

9    they had just received definitions of key terms (such as "D&X"), PPFA and PPGG both

10   responded that as to the requests using those terms, they would provide further response on

11   January 29, 2004, thirty days after learning how to interpret the requests.[4]

12            On January 29, PPFA and PPGG filed supplemental responses and produced

13   additional documents.  PPFA and PPGG responded that *any* abortion performed by the dilatation

14   and extraction ("D&E") method after 16.0 weeks LMP could proceed in such a manner as to fall

15   within Defendant's December 30 definitions.  Without waiving its objections, PPGG produced

16   all patient medical records for all 48 abortions performed at PPGG after 16.0 weeks LMP for the

17   past three years.  PPFA produced all patient records from one year where a woman obtained an

18   abortion by the D&E or D&X method, as defined by Defendant, at a PPFA member-affiliate,

19   _____

20   [3] As counsel for Plaintiffs informed Defendant, these three affiliates each have a protocol for
     dictating the gestational age at which women are offered the option of such an injection.  Based
21   on those protocols, Plaintiffs provided Defendant with the number of women offered an
     injection.  Determining if each of those patients actually received an injection would require
22   PPFA to obtain and review each chart.  Moreover, that number would fail to capture women with
     gestation ages outside of the affiliate's protocol, if any, who requested such an injection and
23   were given one.
     [4] Defendant now complains that taking thirty days from the provision of workable definitions
24   was a "unilateral" extension to which it did not agree (Def. Motion at 10), but Defendant failed
     to complain at the time.  PPFA was clear on January 9 that it would need until January 29 to
25   respond, and counsel for Defendant never informed counsel for PPFA, either by phone or in
     writing, that it objected to that response date.

26

1   where the patient had a complication.  There were 17 such records.[5]  However, PPFA informed

2   Defendant that producing the medical records for all post 16.0 week abortions performed at

3   PPFA-member-affiliates would entail close to 9,000 medical records for 2002, and that the

4   burden of searching, obtaining, redacting, and producing that many medical records outweighed

5   any possible relevance.  *See* PPFA's Jan. 29, 2004 Responses to Interrogatory 10 and Document

6   Requests Nos. 15-17, attached to Def. Motion at Ex. C.

7           Over the next approximately three weeks, there were a series of "meet and

8   confers" and correspondence where Defendant sought to redefine the universe of medical records

9   it sought but, leaving aside relevance and custody and control concerns, each proposal still

10  entailed hundreds of patient records.  *See* Feb. 13, 2004 letter from H. Krasnoff to K. Clark,

11  Adler Decl. Ex. E (request entails approximately 700 patient records); Feb. 18, 2004 letter from

12  K. Clark to H. Krasnoff and D. Adler, attached to Def. Motion at Ex. E; and Feb. 19, 2004

13  response from R. Evans to K. Clark, attached to Def. Motion at Ex. F (February 18 request

14  entails even more than 700 patient records).

15          On February 24, 2004, Defendant filed this motion.

16          **2.       Discovery in *NAF v. Ashcroft***

17          There have been proceedings in *NAF v. Ashcroft* that parallel the issues raised in

18  this motion.  The rulings that resulted from these proceedings provide precedent for denying

19  Defendant's motion.

20          Defendant sought to obtain the medical records of non-party NAF members

21  through party discovery, and NAF objected, claiming that it did not have possession, custody and

22  _____

23  [5] In addition to these records, PPFA and PPGG have produced hundreds of other documents in
24  response to Defendant's requests as well as responded to numerous interrogatories.  *See* PPFA
    Jan. 9 Responses, Adler Decl. Ex. C; PPFA Jan. 29 Supplemental Responses, Def. Motion Ex. C;
25  PPGG Jan. 9 Responses, Adler Decl. Ex. D; PPGG Jan. 29 Supplemental Responses, Def.
    Motion Ex. H.

26

1   control over its members' documents.  Defendant asked the court in *NAF v. Ashcroft* for a ruling

2   that individual members of NAF be treated as parties for the purposes of discovery so that it

3   could obtain their documents.  On January 20, 2004, the district court in New York denied

4   Defendant's request, informing Defendant that if it needed additional information from NAF's

5   individual members, "it can avail itself of Rule 45."  Jan. 20, 2004 Order in *NAF v. Ashcroft*,

6   Adler Decl. Ex. F.  Defendant's present motion is an exact analog to the motion it lost in New

7   York.

8          Moreover, the individual physician-plaintiffs in the *NAF* case also objected to

9   Defendant's attempt to obtain the medical records of their patients because, as hospital-based

10  physicians, they do not have possession, custody and control over those records.  Rather, those

11  records belong to the hospitals.  Immediately thereafter, as early as December 18, Defendant

12  served subpoenas pursuant to Fed. R. Civ. P. 45 on the hospitals at which the NAF plaintiffs

13  work.  Several of the hospitals have resisted the subpoenas on many of the same relevance and

14  privacy grounds raised here by PPFA and PPGG.  One federal district court has already quashed

15  one of Defendant's subpoenas.  *See National Abortion Federation v. Ashcroft*, 2004 WL 292079

16  (N.D. Ill. Feb. 6, 2004) (hereinafter "Kocoras Memorandum Opinion"), Adler Decl. Ex. G.

17              **3.      The Relevance of the Medical Records Sought**

18          With this opposition, Plaintiffs are filing the Declarations of Maureen Paul, M.D.,

19  and Katharine Sheehan, M.D., the Medical Directors, respectively, of Plaintiff PPGG, and of

20  Planned Parenthood of San Diego and Riverside Counties, one of the six PPFA member-

21  affiliates whose medical records are sought by Defendant's motion.

22          These Declarations demonstrate that the medical records sought will neither

23  provide nor lead to relevant evidence.  To the contrary, the medical records will rarely if ever

24  discuss the manner in which the procedure was performed, or why any specific technique was

25  employed.  *See* Declaration of Katharine Sheehan, M.D. ("Sheehan Decl.") at ¶¶ 4, 5;

26  Declaration of Maureen Paul, M.D., M.P.H. ("Paul Decl.") at ¶ 3.  In particular, a patient's

1   medical record will not include information about when during the procedure, and at what point

2   of removal, the fetus dies.  *Id.*  Nor will medical records reveal whether the fetus presented head

3   or feet first, or whether, and if so, in what order fetal parts were disarticulated and removed from

4   the uterus.  Sheehan Decl. at ¶ 4.  Thus, the medical record of an abortion does not reveal

5   information that would assist anyone in determining whether a specific procedure fell within the

6   scope of the Partial Birth Abortion Ban Act.  Paul Decl. at ¶ 3; *see also* Sheehan Decl. at ¶¶ 4, 5.

7            **4.      The Burden and Impact of Defendant's Requests**

8            Plaintiffs also submit Declarations from the chief executive officers of two of the

9   member-affiliates whose records Defendant seeks to obtain from PPFA.  These Declarations,

10  from Mark Salo of Planned Parenthood of San Diego and Riverside Counties ("Salo Decl.") and

11  Joan Malin of Planned Parenthood of New York City ("Malin Decl."), explain what would be

12  involved in terms of the extraordinary amount of time and effort to identify, locate, retrieve, and

13  redact all of the records likely to be responsive to Defendant's discovery.  *See* Salo Decl. at ¶¶ 4,

14  5; Malin Decl. at ¶¶ 5-7.[6]

15           Moreover, as set forth in the Salo Declaration, in response to the news media

16  coverage of the Defendant's discovery dragnet, Planned Parenthood of San Diego and Riverside

17  Counties has begun to receive calls from worried patients, concerned about the disclosure to the

18  government of the records of their abortions.  Salo Decl. at ¶ 6.  This reaction illustrates the tip of

19  the iceberg of patient concern over breaches of privacy concerning this sensitive matter.

20           **5.      Affiliate Records are Not in PPFA's Custody and
                          Control**

21
         In addition to the Salo and Malin Declarations, Plaintiffs are also submitting the

22

23   _____

24   [6] In addition, the Adler Declaration details the efforts involved in producing the medical records
     Defendant already has, and demonstrates how time-consuming it is to search, redact and produce
25   medical records.  *See* Adler Decl. ¶¶ 2-7.

26

1   Declaration of Suellen Craig, the Senior Vice President for the Executive Office of PPFA.[7]  The

2   Craig Declaration, which has attached to it PPFA's Bylaws, makes clear that PPFA cannot

3   compel its affiliates to turn over their medical records, and the Salo and Malin Declarations

4   demonstrate that these member-affiliates are opposed to doing so.  *See* Craig Decl. at ¶¶ 2-8;

5   Salo Decl. at ¶ 3; Malin Decl. at ¶¶ 4, 7.[8]

## III.     PPFA SHOULD NOT BE COMPELLED TO PRODUCE ITS AFFILIATES' MEDICAL RECORDS

### A.     DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE THE MEDICAL RECORDS ARE IRRELEVANT.

9            The discovery Defendant seeks is irrelevant to Plaintiffs' health exception claim.

10  To determine if the Partial Birth Abortion Ban Act is constitutional, in spite of its lack of a health

11  exception, the Court must consider whether there is "substantial medical authority" for the

12  proposition that the procedures banned by the Act offer safety advantages for some women

13  terminating pregnancy.  *Stenberg v. Carhart*, 530 U.S. 914, 936-38 (2000).  If there is

14  "significant body of medical opinion" to demonstrate safety and Plaintiffs' experts "explain[] the

15  medical reasons supporting that view" (*id.* at 937), then a health exception is required and the

16  Act is unconstitutional.

17           Defendant argues that by raising the health exception issue, Plaintiffs "invite an

18  investigation of whether situations exist where the partial-birth abortion procedure would be

19  safer or more medically appropriate than the alternatives.  To evaluate the alternatives, medical

20  records for other second trimester abortion procedures are unquestionably relevant, if not

21  ———————————————

22  [7] Plaintiffs also submit the Declaration of Helene T. Krasnoff, counsel for Plaintiffs PPFA and
    PPGG, to explain that the 17 medical records of PPFA member-affiliates that have already been
23  produced to Defendant were obtained from a third party, and were not in PPFA's possession or
    provided to it by member-affiliates.  Krasnoff Decl. at ¶ 3.
24  [8] Given the time that PPFA had to respond to this Motion, it was only able to obtain declarations
    from these two member-affiliates.  The lack of proof from the other four affected affiliates does
25  not suggest that it would be less burdensome for them to comply, or that they would be any more
    inclined to do so.

26

1   essential to deciding the issue." Def. Motion at 37:25 – 38:2.  Plaintiffs agree with the first

2   component of Defendant's argument, but the second component does not follow from the first

3   and is wrong.

4          An investigation of whether the procedures banned by the Act are sometimes

5   safer or medically necessary is conducted by consulting experts on the subject, not by combing

6   through hundreds of women's medical records.  The district court in Illinois recognized exactly

7   this, when it considered the same issue and quashed Defendant's motion seeking the same

8   records sought here:

9          What the government ignores in its argument is how little, if any, probative value
           lies within these patient records and the ready availability of information
10         traditionally used to challenge the veracity of Dr. Hammond's scientific
           assertions and medical opinions.  The presence or absence of medical risks, their
11         likelihood and nature are undoubtably described and discussed in available
           medical literature. . .

12  Kocoras Memorandum Opinion at *6, Adler Decl. Ex. G.[9]  Indeed, in this case, the parties have

13  named numerous expert witnesses whose testimony focuses on the safety and availability of

14  abortion procedures.

15         Moreover, the Declarations of Drs. Paul and Sheehan demonstrate that, even if the

16  "investigation" that Defendant suggests were relevant, the medical records would be of no

17  assistance.  The records do not regularly, if ever, record information about how a specific

18  procedure progressed, or why it progressed as it did, or when fetal demise occurred, or where the

19  fetus was located vis-à-vis the woman's body when fetal demise occurred.  *See* Paul Decl. ¶ 3;

20  Sheehan Decl ¶¶ 4, 5.  Thus, the medical records would not enable Defendant, or anyone else, to

21

22  _____

23  [9] Defendant's own expert, Dr. Charles Lockwood, the Chair of the Department of Obstetrics,
    Gynecology and Reproductive Sciences at the Yale University School of Medicine, had no
24  trouble concluding that "there clearly is" a significant body of medical opinion that in some
    circumstances, for some women, procedures banned by the Act may be safer.  *See* Lockwood
25  Depo. at 159:20-160:4, Adler Decl. Ex. H.

26

1    determine, months after the abortion, whether it was a procedure banned by the Act, or not. *Id.*

2    Nor would the records reveal the medical judgments that led the physician to proceed and

3    complete the abortion as he or she did. *Id.*

4            In spite of Plaintiffs' position that the medical records of individual women are

5    irrelevant, if any records *are* relevant to the safety of abortion procedures, those would certainly

6    be the records of women where there was a complication in the abortion procedure – not those

7    where the procedure was uneventful.  Without waiving its objections, PPFA has already

8    produced 17 medical records from abortions with complications, *i.e.*, each and every record for

9    all PPFA affiliates for a one-year period where patients experienced medical complications from

10    an abortion performed by D&E or D&X, as defined by Defendant.  In addition, without waiver

11    of its objections, PPGG has produced 48 medical records without medical complications.

12            Defendant has offered no argument as to how the records already produced have

13    provided any relevant information that would justify continuing this dragnet to obtain more than

14    900 additional medical records of women who had second-trimester abortions where there were

15    no complications.  This is because the 65 records already produced to Defendant demonstrate the

16    contrary: that individual patient's medical records are of little, if any, relevance to the issues

17    before this Court.  *See* Paul Decl. ¶ 3; Sheehan Decl. ¶¶ 4, 5.

18
19        **B.**     **DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE IT IMPOSES UNACCEPTABLE BURDENS.**

20            Consideration of the burdens occasioned by Defendant's motion to compel begins

21    with a recognition of the constitutional protections accorded to the information Defendant seeks.

22    "[I]ndividuals have a right protected under the Due Process Clause of the Fifth or Fourteenth

23    Amendments in the privacy of personal medical information and records."  *Yin v. California*, 95

24    F.3d 864, 870 (9th Cir. 1996); *Caesar v. Mountanos*, 542 F.2d 1064, 1067 n.9 (9th Cir. 1976);

25    *see also United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) ("There

26    can be no question that . . . medical records, which may contain intimate facts of a personal

1  nature, are well within the ambit of materials entitled to privacy protection.").  The privacy

2  interests of the hundreds of women whose medical records Defendant seeks must be considered

3  as part of the evaluation of the burdens imposed by Defendant's discovery requests.

4  *Westinghouse*, 638 F.2d at 578.

5      When the District Court in Illinois considered the balance between the privacy

6  rights of the affected women, and the Defendant's need for the abortion records sought, the

7  outcome was clear:

8      When contrasted with the potential loss of privacy that would ensue were these
   medical records used in a case in which the patient was not a party, the balance of
9      harms resulting from disclosure severely outweighs the loss to the government
   through non-disclosure.

10

11  Kocoras Memorandum Opinion at *6, Adler Decl. Ex. H.

12      In addition to the burden on the patients' privacy rights, the Court should

13  weigh the burden of the extraordinary time and effort that will have to be expended by

14  PPFA and the six member-affiliates, so close to trial, in identifying the approximately

15  900 relevant records (*see* Krasnoff Decl. ¶ 4), locating them, and then redacting all of the

16  possibly identifying information of both the women patients and clinic staff.

17      The Salo and Malin Declarations demonstrate that each affiliate will have

18  different hurdles in collecting responsive medical records.  For example, the requested

19  records of Planned Parenthood of San Diego and Riverside Counties could be housed in

20  19 different Planned Parenthood sites – or in storage, requiring retrieval from an off-site

21  medical records storage facility.  Salo Decl. at ¶ 4.  To respond to the requests to Planned

22  Parenthood of New York City, someone would have to examine more than 10,000 entries

23  in the individual procedure logs from each operating room to determine which records

24  may be responsive.  Malin Decl. at ¶¶ 5, 6.

25      The burden does not end there.  Each medical record has to be taken apart,

26  copied, put back together, and re-filed.  Adler Decl. ¶¶ 3, 4.  The copy must then be

1   redacted which, given the sensitivity of this issue and the information contained in the

2   records, is a time-consuming process. *Id.* at ¶ 5. PPGG's experience producing its

3   medical records was that the process of gathering, redacting and producing PPGG's 48

4   medical records took approximately 2.5 hours per record. *Id.* at ¶¶ 2, 7. Based on this

5   figure, it would take well over 2000 hours of time to produce the extraordinary number

6   of records sought here.

7   　　　　When these burdens are balanced against the remote, if any, relevance of the

8   records to this litigation, and the constitutional privacy concerns of the individual women are

9   also included, there can be no doubt that Defendant's motion to compel should be denied. *See*

10  Fed. R. Civ. P. 26(b)(2)(iii) (Discovery shall be limited by the court if it determines that "the

11  burden or expense of the proposed discovery outweighs its likely benefit, taking into account the

12  needs of the case, the amount in controversy, the parties' resources, the importance of the issues

13  at stake in the litigation, and the importance of the proposed discovery in resolving the issues.").

14  Because Defendant cannot show that the additional patient medical records it requests will assist

15  in its defense of the Act, there is no justification for imposing on PPFA's member-affiliates the

16  burden of producing more than 900 records and the risk of revealing the private, medical

17  information of its patients.

18      **C.    DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE IT
19             VIOLATES STATE PRIVACY LAW.**

20  　　　　In addition to the constitutionally-grounded privacy rights of the individual

21  women, discussed *supra*, these women – and their medical records – are protected by varying

22  state law protections. These protections are also applicable here. Defendant argues that, under

23  Federal Rule of Evidence 501, federal common law governs this case and that, because federal

24  common law does not recognize a physician-patient privilege, the requested documents must be

25  produced. Def. Motion at 22, 38. This argument has, however, already been rejected by the

26  federal district court in Illinois. Kocoras Memorandum Opinion at 11-13, Adler Decl. Ex. H

1   (holding that the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.

2   L. No. 104-91, §§ 261-264, 110 Stat. 1936 (Aug. 21, 1996) is an "Act of Congress" within the

3   meaning of Fed. R. Evid. 501, and therefore, state law protections apply).  Therefore, before

4   granting Defendant's motion to compel, the privacy laws of not just California, but also of New

5   York, Washington, D.C., Kansas, and Pennsylvania must be considered.

6          **1.**        **California**

7          Under California Evidence Code § 994, a patient, whether or not she is a party to

8   litigation, has a privilege to refuse to disclose, and prevent another from disclosing, confidential

9   communications between her and her physician in civil proceedings.  In addition, physicians

10  have an affirmative duty to claim the privilege on the patient's behalf if present when the

11  communication is sought to be disclosed.  Cal. Evid. Code § 995; *People v. Superior Court*, 25

12  Cal. 4th 703, 713 (2001) ("[C]ustodian of materials protected by an evidentiary privilege owes a

13  duty to the holder of the privilege to claim the privilege and to take actions necessary to ensure

14  that the materials are not disclosed improperly").  The privilege is asserted to avoid humiliation

15  to the patient, and to encourage the patient's complete and uninhibited disclosure of information

16  necessary for diagnosis and treatment.  *Brillantes v. Superior Court*, 51 Cal. App. 4th 323, 334

17  (1996); *see also Palay v. Superior Court*, 18 Cal. App. 4th 919, 927-28 (1993) (the privilege is

18  statutory and encourages the patient to be free in disclosing facts about her illness to enable the

19  physician to treat the illness or maintain the patient's general health).  "Surely no aspect of a

20  woman's medical profile is more sensitive in terms of privacy interests than her obstetrical-

21  gynecological history."  *Jones v. Superior Court*, 119 Cal. App. 3d 534, 549 (1981).  As HIPAA

22  contains no physician-patient privilege, California law is more restrictive than and is contrary to

23  HIPAA; it is therefore not preempted by HIPAA and its subsequent regulations.

24         **2.**        **New York**

25         New York statutorily imposes an obligation on health care providers to keep

26  patient information confidential and to disclose it only in accordance with its statute.  N.Y. Pub.

1    Health Law § 18(1)(b) and (6).  New York also recognizes a physician-patient privilege, holding

2    that allowing disclosure of medical records would discourage critical care, intrude on patients'

3    confidential medical relationships and undermine patients' reasonable expectations of privacy."

4    *In re Grand Jury Investigation in New York County*, 98 N.Y.2d 525, 532 (2002) (upholding a

5    hospital corporation's refusal to comply with grand jury subpoenas seeking the medical records

6    of any male patients treated on given dates for wounds caused by a cutting instrument).  New

7    York law is thus not preempted by HIPAA, as it is more stringent than HIPAA.

8              **3.      Washington D.C.**

9              The D.C. Bill of Rights provides that individual privacy regarding health records

10   must be protected by laws prohibiting disclosure that may result in a violation of individual

11   privacy.  D.C. Code Ann., Art. I, Bill of Rights § 4 (2001).  Thus, the District of Columbia has

12   enacted a statutory physician-patient privilege that prevents a physician from disclosing, without

13   the consent of the patient, confidential information that was necessary to the provision of

14   professional services.  D.C. Code Ann. § 14-307 (2001).  The District of Columbia courts have

15   assumed, without expressly deciding, that the privilege applies to medical records as well as to

16   testimony.  *See, e.g., Edwards v. U.S.,* 767 A.2d 241, 249 (D.C. 2001); *Nelson v. U.S.,* 649 A.2d

17   301, 307-308 (D.C. 1994).

18             **4.      Kansas**

19             Kansas recognizes a physician-patient privilege.  Kan. Stat. Ann. §§ 60-427.

20   Under Kan. Stat. Ann. §§ 60-427(a)(4) and (b), a patient, whether or not a party to a civil suit,

21   may prevent disclosure of confidential information provided to or from a physician, including

22   information obtained by an examination of the patient.  This medical privacy protection prevents

23   a physician, "absent statutory authority," from revealing, "ex parte, information [including

24   documents, such as medical records] subject to the privilege without the knowledge and consent

25   of the patient."  *Wesley Medical Center v. Clark,* 669 P.2d 209, 214-15 (Kan. 1983).  This

26   medical privacy protection applies even if the patients' names or other identifying information

1    are redacted, as redaction may not provide "sufficient protection and anonymity." *Id* at 215.  As

2    HIPAA contains no physician-patient privilege, Kansas law is more restrictive than and is

3    contrary to HIPAA; it is therefore not preempted by HIPAA and its subsequent regulations.

4                **5.**      **Pennsylvania**

5          Under Pennsylvania law, a physician may not in a civil action "disclose any

6    information which he acquired in attending the patient in a professional capacity, and which was

7    necessary to enable him to act in that capacity, which shall tend to blacken the character of the

8    patient." 42 Pa. C.S.A. § 5929.  Information that a patient provides to her physician in

9    connection with seeking an abortion may well be of the nature that some would view as

10    "blacken[ing] the character of the patient."  *Id.*  Indeed, based on this provision, a Pennsylvania

11    court concluded that medical records of abortion patients contain privileged communications,

12    precluding a prosecutor from subpoenaing these records in a civil context.  *Berman v. Duggan*,

13    119 Pittsburgh Legal Journal 226, 234-36 (Allegheny Cty., Civ. Div. Jan. 6. 1971) (copy

14    attached to Adler Decl. Ex. I).

15          Compulsion of patient medical records absent a showing that relevant state law

16    allows production of records is improper.  Patients' privacy rights must weigh against the little, if

17    any, probative value contained in the medical records.

18        **D.**      **DEFENDANT'S DISCOVERY EFFORTS ARE TOO LATE.**

19          As the Court knows, on December 4, an agreed pretrial order was entered, setting

20    a discovery cut-off date of March 1.  Under that Order, witness lists were filed on March 1,

21    motions *in limine*, and exhibit lists must be filed by March 8, and deposition designations will be

22    filed on March 10.  Well-aware of the tight deadlines, Defendant waited inexplicably until the

23    last minute to file this motion.

24          As outlined in Section II.1., *supra*, PPFA told Defendant that its member-

25    affiliates' documents were not in its possession, custody and control on December 19, 2003.  If

26    that was not sufficient notice, the court in New York ruled against Defendant on this very issue

1  on January 20, informing it that if it wanted to seek documents from non-party NAF members, it

2  would have to use Fed. R. Civ. P. 45.  If Defendant needed further clarification of whether this

3  Court agreed with the court in *NAF v. Ashcroft*, it should have moved at that time and served its

4  Rule 45 notices then, rather than delaying until the week before the close of discovery to resolve

5  this issue.  Similarly, PPFA was clear on January 9, 2004, that it believed that the burden of

6  searching, obtaining, redacting, and producing approximately 468 medical records outweighed

7  the likely benefit of those records.  *See* PPFA's Jan. 9, 2004 Responses to Document Requests

8  Nos. 18-20, Adler Decl. Ex. C.  If Defendant wanted *even more* medical records from PPFA

9  member-affiliates (as it seeks in this Motion), it should have moved then. [10]

10  **E.       AFFILIATES' MEDICAL RECORDS ARE NOT IN PPFA'S**
             **POSSESSION, CUSTODY OR CONTROL.**

11

12       Defendant does not contest that PPFA lacks possession of patient medical

13  records; rather, it contends, based on faulty assumptions and a tortured reading of PPFA's

14  responses, that PPFA has control of the affiliates' records.  *See* Def. Motion at 34:13-15.  Where

15  a party denies it has possession, custody or control of documents, the discovering party must

16  make an adequate showing to overcome this assertion.  *See generally* 4A Moore *et al., supra,*

17  ¶ 34.17 at 34-68 to 69 ("A party who denies under oath that the requested documents exist, or

18  that they are within his custody or control, may not be compelled to produce them").

19       Under Fed. R. Civ. P. 34, "control" is customarily interpreted as requiring that the

20  party have "the legal right to obtain the documents requested on demand."  *Searock v. Stripling*,

21  736 F.2d 650, 653 (11th Cir. 1984); *see also Chaveriat v. Williams Pipe Line Company*, 11 F.3d

22  1420, 1426 (7th Cir. 1993).  The fact "that a party could obtain a document if it tried hard

23  enough and maybe if it didn't try hard at all does not mean that the document is in its possession,

24  custody, or control." *Id.* at 1427.  PPFA cannot be deemed to have control of documents on the

25  ───────────────

26  [10] Of course, the burden of such a large production only increases the closer it comes to trial.

1  sole basis that it brought this action on their behalf.  *See Oil Heat Institute of Oregon v.*

2  *Northwest Natural Gas*, 123 FRD 640, 642 (D. Oregon 1988) (holding that a nonprofit trade

3  organization was not required to produce information that was solely within custody or control of

4  its individual members); *see also CBS Broad., Inc. v. Echostar Communications Corp.*, No. 98-

5  2651-CIV-Dimitrouleas/Seltzer, slip. op. at 26-27 (S.D. Fla. Jan. 10, 2003) (rejecting attempt to

6  obtain party discovery from non-party members of four TV network affiliate associations

7  through discovery served on the party associations) (copy attached to Adler Dec. Ex. J).  This

8  legal principle is precisely the ground on which the Southern District of New York in *NAF v.*

9  *Ashcroft* found that Defendant could not seek discovery of Plaintiff NAF's individual members

10  by virtue of NAF having sued on their behalf.  *See* Adler Decl. Ex. F.

11       PPFA's Bylaws make clear that PPFA lacks control over affiliates' medical

12  records, because its relationship with its affiliates does not grant it the legal right to obtain

13  documents upon demand.  *See* Craig Decl. Ex. A.  Each affiliate is an independent, non-profit

14  organization, governed by its own elected Board of Directors, and employing its own chief

15  executive.  *See id.* at Art. XIII § 3 (a), (b) and (f).  Affiliates publicly support the purposes of

16  PPFA, take part in forming policy and approving long-range goals and priorities of the

17  Federation, and receive the right to use PPFA's Trademarks.  *See id.* at Articles III and XIII

18  § 2(a), (c).  But the Bylaws give PPFA no right to direct, supervise or control its affiliates, and

19  no authority to demand their medical records.

20       Defendant bases its argument that PPFA has control on three assumptions, all of

21  which are wrong.  First, it argues that because PPFA has produced *some* documents from its

22  member-affiliates, it must have the ability to obtain *all* responsive documents.  *See* Def. Motion

23  at 35:3-10.  As the Salo and Malin Declarations make clear, documents that PPFA produced in

24  response to Defendant's Document Requests Nos. 2, 8, 10, 13 and 14, were voluntarily given to

25  PPFA by the affiliates.  *See* Salo Decl. ¶ 3; Malin Decl. ¶ 7.  Those were not patient medical

26  records, but already publicly available and/or non-sensitive materials.  *Id.*  PPFA member-

1   affiliates would not be so willing to turn over the charts of the women who trust them with their

2   care. *Id.*; *see also* Malin Decl. at ¶ 3. The medical records PPFA produced per Document

3   Requests Nos. 21-23, which sought records from abortions with complications, were not

4   obtained by PPFA from its affiliates but from a third party. *See* Krasnoff Decl. ¶ 3. PPFA's

5   production of those records implies nothing about its ability to obtain the 900 records sought in

6   this Motion.

7          Second, Defendant incorrectly infers "some degree of control" from PPFA's

8   discovery response that it would use its "best efforts to obtain and produce responsive

9   documents, if any, from PPFA member-affiliates." Def. Motion at 35:13-21. PPFA's promise to

10  make a good faith effort to obtain documents over which it lacked control undercuts Defendant's

11  argument rather than supports it. If PPFA controlled the documents, as Defendant contends, no

12  "good faith effort" would be necessary to obtain them. Third, Defendant claims that PPFA's

13  accreditation process manifests its practical ability to obtain documents from its member-

14  affiliates. *See* Motion to Compel, 35:22-26. This allegation is a flawed assumption. The

15  Bylaws define the obligations between PPFA and its member-affiliates. They require

16  cooperation for purposes of accreditation review, but there is no requirement concerning the

17  delivery of medical records outside of the context of the accreditation review. *See* Craig Decl.

18  ¶ 6.[11]

19         Finally, Defendant makes a misplaced fairness argument. The fact that PPFA

20  sues on behalf of its member-affiliates, and that, as a result, those member-affiliates have

21  received the benefit of the temporary injunction in this case, is irrelevant. The very purpose of

22  associational standing is to allow the members of an organization to reap the benefits of litigation

23  _____

24  [11] Moreover, even in an accreditation review, medical records are reviewed on site at the

25  affiliate, may not be copied or removed from the premises, and no notes may be made of the
     contents of the records. *See* Craig Decl. ¶ 6.

26

1   without being parties.  As courts have repeatedly recognized, "the primary reason people join an

2   organization is often to create an effective vehicle for vindicating interests that they share with

3   others."  *Roe v. Operation Rescue*, 919 F.2d 857, 865 (3d Cir. 1990) (citing *International Union,*

4   *United Automobile, Aerospace, and Agricultural Implement Workers of America v. Brock*, 477

5   U.S. 274, 290 (1986)).  It would seriously undermine the benefits of representational standing if

6   the Court refused to distinguish for discovery purposes between a party-organization and its

7   third-party members.

8           For all of the foregoing reasons, PPFA should not be compelled at this late date to

9   produce more than 900 medical records in the control of its member-affiliates that are of little

10  relevance to the issues in this case.

11  **IV.    PPFA AND PPGG SHOULD NOT BE COMPELLED TO UNREDACT**
    **PHYSICIAN NAMES FROM MEDICAL RECORDS**

12          Compelling Plaintiffs to reveal the identity of physicians on medical records will

13  provide no benefit to the government.  Because, as discussed in Section III.A., *supra*, the

14  medical records produced by PPFA and PPGG have little, if any, probative value, the identity of

15  the physicians that created the records are also irrelevant, and should not be disclosed to the

16  government.  Even if the medical records were relevant, the timing of the government's request

17  renders the identity of the physicians irrelevant.  Both parties have already designated their

18  witnesses for trial.  The deadline for taking depositions has passed.  *Id.*  Whatever information

19  the government might have obtained from the physicians identified on the medical records is no

20  longer relevant to anything going forward in this action. [12]

21

_____

22  [12] The government's argument as to its need for physician names is specious.  It states that the
    identification of physicians "who utilize chemical injections to bring about fetal demise in
23  advance of performing abortions, or who perform abortions using inductions" will provide
    defendant with the opportunity to obtain testimony from or concerning these knowledgeable
24  individuals."  Def. Motion at 39:16-23.  However, PPGG's physicians do not utilize chemical
    injections and no PPFA affiliate performs inductions, as Plaintiffs informed Defendant in their
25  first Responses on January 9.  *See* PPGG Jan. 9 Response to Interrogatory No. 4, Adler Decl. Ex.

26                                              (Footnote Continued on Next Page.)

1    In contrast, requiring PPFA and PPGG to identify the physicians who perform

2 abortions that may be subject to the Act would have a powerful *in terrorem* effect.  This

3 identification would wholly undermine the intent of the temporary injunction by deterring

4 physicians from performing second trimester abortions for fear of future prosecution, thereby

5 depriving women of the ability to exercise their constitutional rights.  Despite the Court's

6 temporary injunction, physicians could reasonably fear that if their names are disclosed to the

7 entity that is responsible for the enforcement the Act and the constitutionality of the statute is

8 ultimately upheld, they will be targeted for investigation or prosecution.[13]  Moreover, many

9 physicians who provide abortions at Planned Parenthood facilities also do so at hospitals or other

10 clinics.  While the Planned Parenthood physicians are subject to the Court's injunction, their

11 colleagues at other facilities may not be, causing fear in the Planned Parenthood physicians that

12 if they are identified and subject to discovery, they will put their colleagues at risk of

13 prosecution.

14    This *in terrorem* effect requires that the court preclude discovery of this sensitive

15 information.  In *Flores v. Amigon*, 233 F. Supp. 2d 462 (E.D.N.Y. 2002), the defendant, an

16 employer who had hired an undocumented worker, sought discovery of the employee's

17 immigration status, on the grounds that it was relevant to determine whether she was entitled to

18 backpay under the Fair Labor Standards Act for work performed.  The court held that even if the

19 information were relevant, the potential prejudice resulting from its disclosure would "far

20 outweigh[]" its probative value.  *Flores*, 233 F. Supp. 2d at 464-65.  "If forced to disclose their

21 _____

(Footnote Continued from Previous Page.)

22 D; PPFA Jan. 9 Response to Interrogatory No. 3, Adler Decl. Ex. C.

23 [13] Defendant's conduct to date highlights the danger that a physician faces in having his or her
name disclosed to the government.  After Dr. Cassing Hammond testified that he performs D&E

24 abortions in a manner that may violate the Act, the government asked Dr. Hammond four
different times whether he would change his practice if the Partial Birth Abortion Act were

25 upheld, and whether he would continue performing abortions through the D&E procedure.  *See*
Hammond Depo. at 198:5-202:16, Adler Decl. Ex. K.

26

1   immigration status, most undocumented aliens would withdraw their claims or refrain from

2   bringing an action such as this in the first instance.  This would effectively eliminate the FLSA

3   as a means for protecting undocumented workers from exploitation and retaliation."  *Id.* at 465

4   n.2.  Like the plaintiffs in *Flores*, physicians might be chilled from performing second trimester

5   abortions if forced to disclose their identities to the agency in charge of prosecution of the Act.

6           Even a protective order restricting disclosure of the physicians' identities does not

7   adequately protect their rights and the rights of their patients.  Where "privacy interests outweigh

8   countervailing state interests, there is simply no justification for any invasion of the nonparties'

9   privacy rights," regardless of the existence of a protective order.  *PPGG v. Superior Court (Foti)*,

10   83 Cal.App.4th 347, 369-70 (2000) (physician names can be withheld in discovery even where a

11   protective order exists between the parties); *see also Zeng Liu v. Donna Karan Int'l, Inc.*, 207 F.

12   Supp. 2d 191, 192 (S.D.N.Y. 2002) (allowing discovery of an undocumented worker's

13   immigration status, even with confidentiality protections, would create "'the danger of

14   intimidation, the danger of destroying the cause of action' and would inhibit plaintiffs from

15   pursuing their rights.").  Here, disclosing the physicians' identities, even in a limited fashion,

16   could deter physicians from performing abortions, and in turn, diminish women's rights.

17   Therefore, the Court should deny the government's request for this highly sensitive information.

18   **V.      THE COURT SHOULD DENY DEFENDANT'S ADMINISTRATIVE REQUEST
19              TO ALTER THE PRE-TRIAL SCHEDULING ORDER.**

20           As is discussed more fully in Sections II.1. and III.D., *supra*, PPFA served its

21   objections to Defendant's discovery requests on December 19, 2003, stating that PPFA's

22   member-affiliates' records were outside PPFA's possession, custody or control.  The government

23   did not attempt to obtain discovery from member-affiliates through third-party subpoenas until

24   February 24, 2004, less than a week before the discovery cut-off, although it had done so in *NAF

25   v. Ashcroft* months earlier.  Having been apparently unwilling to subpoena member-affiliates

26   during the discovery period, the government now makes the extraordinary request that this Court

1   extend the discovery period to March 12 – seventeen days before trial begins – and increase the

2   number of nonparty witness depositions defendant may take.  The pre-trial scheduling order in

3   this case established a discovery and deposition deadline of March 1, 2004, and specifically

4   permitted each party to depose five nonparty witnesses.  The government's request to alter the

5   Court's scheduling order is unwarranted for the same reasons that its motion to compel is

6   unwarranted.  The records and depositions it seeks are irrelevant, the burden to the nonparties is

7   great, and the government's request is dilatory.  Therefore, the Court should deny Defendant's

8   request either to extend time and/or for leave to take additional depositions.

9   **VI.   CONCLUSION**

10          For all of the foregoing reasons, Plaintiffs PPFA and PPGG respectfully request

11  that the Court deny Defendant's February 24 Motion to Compel and Administrative Request to

12  Extend Time for Completion of Depositions and/or for Leave to Take Additional Depositions.

13
    DATED:  March 2, 2004
14

15                              BINGHAM McCUTCHEN LLP

16

17
                                By:_____/s/_____
18                                            Roger K. Evans

19

20

21

22

23

24

25

26